Opinion for the Court filed by Circuit Judge GRIFFITH.
Concurring opinion filed by Senior Circuit Judge EDWARDS.
GRIFFITH, Circuit Judge:
It has been the longstanding policy of the United States to take no side in the contentious debate over whether Jerusalem is part of Israel. In this case, the federal courts are asked to direct the Secretary of State to contravene that policy and record in official documents that Israel is the birthplace of a U.S. citizen born in Jerusalem. Because the judiciary has no authority to order the Executive Branch to change the nation’s foreign policy in this matter, this case is nonjusticiable under the political question doctrine.
I.
That the United States expresses no official view on the thorny issue of whether Jerusalem is part of Israel has been a central and calibrated feature of every president’s foreign policy since Harry S. Truman. See Br. for Appellee at 6; J.A. at 57 (Defendant’s Responses to Plaintiffs Interrogatories). State Department policy governing how to describe the status of Jerusalem in passports and Consular Reports of Birth[1] of U.S. citizens born there implements the presidential decision to remain neutral. Although the State Department typically records a passport holder’s birthplace as the nation with sovereignty over his city of birth, see 7 U.S. Dep’t of State, Foreign Affairs Manual § 1383.1, passports issued to U.S. citizens born in Jerusalem note only the city, see id. § 1360, app. D (“For a person born in Jerusalem, write JERUSALEM as the place of birth in the passport. Do not write Israel.... ”). The State Department follows the same policy for Consular Reports of Birth. See Br. for Appellee at 9.
In 2002, Congress passed the Foreign Relations Authorization Act, Fiscal Year 2003, Pub.L. No. 107-228, 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 2651 note (2006)). Section 214 of the Act, entitled “United States Policy with Respect to Jerusalem as the Capital of Israel,” challenges the Executive’s position on the status of Jerusalem. Id. § 214, 116 Stat. at 1365. Subsection 214(a), for example, “urges the President ... to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem.” Id. § 214(a), 116 Stat. at 1365. Under subsection 214(c), Congress forbids the Executive from using appropriated funds for “publication of any official governmental document which lists countries and their capital cities unless the publication *1209 identifies Jerusalem as the capital of Israel.” Id. § 214(c), 116 Stat. at 1366. And subsection 214(d), the provision at issue in this case, states:
Record of Place of Birth as Israel for Passport Purposes. — For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen’s legal guardian, record the place of birth as Israel.
Id. § 214(d), 116 Stat. at 1366. In a written statement issued when he signed the bill into law, the President took the view that section 214 is merely advisory because a congressional command to the Executive to change the government’s position on the status of Jerusalem would “impermissibly interfere with the President’s constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms • on which recognition is given to foreign states.” President George W. Bush, Statement on Signing the Foreign Relations Authorization Act, 38 Weekly Comp. Pres. Doc. 1659 (Sept. 30, 2002). Even in signing the Act, the President made clear that “U.S. policy regarding Jerusalem has not changed.” Id.
Enactment of the law provoked confusion and criticism overseas. The U.S. Consulate in Jerusalem informed the State Department that “[d]espite [its] best efforts to get the word out that U.S. policy on Jerusalem has not changed, the reservations contained in the President’s signing statement have been all but ignored, as Palestinians focus on what they consider the negative precedent and symbolism of an American law declaring that Israel’s capital is Jerusalem.” J.A. at 398 (October 2002 declassified cable from the U.S. Consulate in Jerusalem to the Secretary of State); see also id. at 396-97 (October 2002 declassified cable from the State Department to U.S. missions abroad).
In October 2002, Menachem Zivotofsky was born in Jerusalem to parents who are U.S. citizens, making him a citizen as well. See 8 U.S.C. § 1401(c) (2006). In December 2002, Menachem’s mother applied for a U.S. passport and a Consular Report of Birth for her son at the U.S. Embassy in Tel Aviv, Israel. She requested that both documents record her son’s place of birth as “Jerusalem, Israel.” U.S. diplomatic officials told Mrs. Zivotofsky that State Department policy forbade them from recording “Israel” as her son’s birthplace. Consistent with its policy, the State Department issued a passport and Consular Report of Birth identifying “Jerusalem” as Menachem’s place of birth without reference to Israel.
In September 2003, Menachem (by his parents) filed this action for declaratory and injunctive relief ordering the State Department to comply with the directive in section 214(d) and record “Jerusalem, Israel,” as his birthplace in both his passport and Consular Report of Birth. The district court ruled that Menachem lacked standing to complain about the contents of the documents because he could use them regardless of how they described his birthplace. Invoking the political question doctrine, the court also concluded that it was without jurisdiction to consider his claim because there is “a textually demonstrable constitutional commitment of the issue to a coordinate political department.” Zivotofsky v. Sec’y of State, No. 03-1921, slip op. at 9 (D.D.C. Sept. 7, 2004) (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). In the district court’s view, the “desired passport wording ... would confer recognition in an official, diplomatic document that Israel has sovereignty over Jerusalem.” Id. at 10. Such a result, the court held, would *1210 unlawfully trench upon the Executive’s exclusive power to recognize foreign governments. Id.
We reversed the district court’s decision on standing, concluding that the relevant issue is not whether Zivotofsky can use his passport. He has standing because “Congress conferred on him an individual right to have ‘Israel’ listed as his place of birth on his passport and on his Consular Birth Report,” and “the Secretary of State violated that individual right.” Zivotofsky v. Sec’y of State, 444 F.3d 614, 619 (D.C.Cir. 2006). We also remanded the case for the district court to determine whether section 214(d) is mandatory or advisory, develop a more complete record, and consider the implications, if any, of Zivotofsky’s request, first made in his motion for summary judgment, that his passport and Consular Report of Birth record “Israel” as his place of birth, instead of noting “Jerusalem, Israel,” as he pleaded in the complaint. Id. at 619-20. On remand, the district court granted the Secretary’s motion to dismiss for lack of subject matter jurisdiction under Fed.R.CivP. 12(b)(1), holding again that because the complaint asserts a claim that implicates the President’s recognition power, it “raises a quintessential political question which is not justiciable by the courts.” Zivotofsky v. Sec’y of State, 511 F.Supp.2d 97, 102 (D.D.C.2007).
Zivotofsky appeals the district court’s dismissal of his case, which we review de novo. See Piersall v. Winter, 435 F.3d 319, 321 (D.C.Cir.2006). We have jurisdiction to consider the appeal under 28 U.S.C. § 1291 (2006). The threshold question before us is whether the courts have jurisdiction to provide Zivotofsky the relief he seeks or whether he must pursue his remedies from the political branches. See Lin v. United States, 561 F.3d 502, 504 (D.C.Cir.2009).
II.
In Baker v. Carr, the Supreme Court held that courts may not consider claims that raise issues whose resolution has been committed to the political branches by the text of the Constitution. 369 U.S. at 217, 82 S.Ct. 691; see also Japan Whaling Ass’n v. Am. Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (stating that the judiciary may not review “policy choices and value determinations constitutionally committed” to Congress or the Executive). Following the framework laid out in Nixon v. United States, we begin by “interpret[ing] the [constitutional] text in question and determinfing] whether and to what extent the issue is textually committed” to a political branch. 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); see also Clinton v. Jones, 520 U.S. 681, 700 n. 34, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); Powell v. McCormack, 395 U.S. 486, 519, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). But to perform the analysis prescribed by Nixon, we must first determine “the issue” before us. Only then can we decide whether that issue has been committed by the Constitution solely to the political branches or whether it is a proper matter for the judiciary to resolve. See Nixon, 506 U.S. at 228, 113 S.Ct. 732. Relying on section 214(d) of the Foreign Relations Authorization Act, Zivotofsky asked the district court to “order[ ] the [Secretary of State] to issue a passport to [him] specifying [his] place of birth as [Israel]” and to instruct the Executive “to comply with Section 214(d).” Compl. ¶ 9. Given Zivotofsky’s claim, the issue before us is whether the State Department can lawfully refuse to record his place of birth as “Israel” in the face of a statute that directs it to do so. See id. The issue is not, as the concurrence asserts, “[w]hether § 214(d) ... is a constitutionally valid enactment,” Concurring Op. at 1234. This critical difference *1211 sets us on different paths at the very outset.
It is well established that the Constitution’s grant of authority to the President to “receive Ambassadors and other public Ministers,” U.S. CONST, art. II, § 3, includes the power to recognize foreign governments. See, e.g., Louis Henkin, Foreign Affairs and the United States Constitution 38 (2d ed.1996) (explaining that the ambassadorial receipt clause in Article II “implies [the] power to recognize (or not to recognize) governments”). That this power belongs solely to the President has been clear from the earliest days of the Republic. See Saikrishna B. Prakash & Michael D. Ramsey, The Executive Power over Foreign Affairs, 111 Yale L.J. 231, 312-13 (2001) (“Congress never dictated [to President George Washington] which countries or governments to recognize because it understood that the Constitution had shifted the recognition power from Congress to the President.”). The Supreme Court has recognized this constitutional commitment of authority to the President repeatedly and consistently over many years. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (“Political recognition [of a foreign sovereign] is exclusively a function of the Executive.”); Goldwater v. Carter, 444 U.S. 996, 1007, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Brennan, J., dissenting) (“Our cases firmly establish that the Constitution commits to the President alone the power to recognize, and withdraw recognition from, foreign regimes.” (citing Sabbatino, 376 U.S. at 410, 84 S.Ct. 923; Baker, 369 U.S. at 212, 82 S.Ct. 691; United States v. Pink, 315 U.S. 203, 228-30, 62 S.Ct. 552, 86 L.Ed. 796 (1942))).
The President’s exercise of the recognition power granted solely to him by the Constitution cannot be reviewed by the courts. See, e.g., Nat’l City Bank v. Republic of China, 348 U.S. 356, 358, 75 S.Ct. 423, 99 L.Ed. 389 (1955) (“The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court.”). A decision made by the President regarding which government is sovereign over a particular place is an exercise of that power. As the Supreme Court explained nearly two hundred years ago, “when the executive branch ... assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department.” Williams v. Suffolk Ins. Co., 38 U.S. 415, 418, 13 Pet. 415, 10 L.Ed. 226 (1839) (refusing to question the President’s decision regarding which country exercised sovereignty over the Falkland Islands); see also Baker, 369 U.S. at 212, 82 S.Ct. 691 (“[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory... .”). As a result, we have declined invitations to question the President’s use of the recognition power. See Lin, 561 F.3d at 508 (refusing to deem residents of Taiwan U.S. nationals and to declare that they are entitled to U.S. passports because courts may not intrude on the Executive’s decision to remain silent about Taiwan’s sovereignty).
Thus the President has exclusive and unreviewable constitutional power to keep the United States out of the debate over the status of Jerusalem. Nevertheless, Zivotofsky asks us to review a policy of the State Department implementing the President’s decision. But as the Supreme Court has explained, policy decisions made pursuant to the President’s recognition power are nonjusticiable political questions. See Pink, 315 U.S. at 229, 62 S.Ct. 552 (“Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts.”). And every presi *1212 dent since 1948 has, as a matter of official policy, purposefully avoided taking a position on the issue whether Israel’s sovereignty extends to the city of Jerusalem. See Br. for Appellee at 6; J.A. at 57 (Defendant’s Responses to Plaintiffs Interrogatories). The State Department’s refusal to record “Israel” in passports and Consular Reports of Birth of U.S. citizens born in Jerusalem implements this longstanding policy of the Executive. See Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (recognizing that a U.S. passport is an official government document used to communicate with foreign governments). By asking the judiciary to order the State Department to mark official government documents in a manner that would directly contravene the President’s policy, Zivotofsky invites the courts to call into question the President’s exercise of the recognition power. This we cannot do. We therefore hold that Zivotofsky’s claim presents a nonjusticiable political question because it trenches upon the President’s constitutionally committed recognition power.
Zivotofsky argues that the political question doctrine cannot foreclose a court from enforcing a duly enacted law. In his view, this court is asked to do nothing more than interpret a federal statute — a task within our power and competency. To grant the requested relief would not require that we determine the status of Jerusalem, he argues, because enactment of section 214(d) has decided that question. Enforcement of the rights Congress created presents no political question. The government responds that even if we find jurisdiction to consider Zivotofsky’s claim, we must nevertheless strike section 214(d) as an unconstitutional infringement on the President’s recognition power. We agree that resolving Zivotofsky’s claim either at the jurisdictional stage under the political question doctrine or on the merits by striking section 214(d) implicates the recognition power. Only the Executive — not Congress and not the courts — has the power to define U.S. policy regarding Israel’s sovereignty over Jerusalem and decide how best to implement that policy. The question for us is whether Zivotofsky loses on jurisdictional grounds, or on the merits because Congress lacks the power to give him an enforceable right to have “Israel” noted as his birthplace on his government documents.[2]
Under the Supreme Court’s precedent and our own, the answer must be the former. We are aware of no court that has held we cannot or need not conduct the jurisdictional analysis called for by the political question doctrine simply because the claim asserted involves a statutory right. We must always begin by interpreting the constitutional text in question and determining “whether and to what extent the issue is textually committed.” Nixon, 506 U.S. at 228,113 S.Ct. 732. The question is not whether the courts are competent to interpret a statute. Certainly we are. But as our recent decision makes clear, we will decline to “resolve [a] case through ... statutory construction” when it “presents a political question which strips us of jurisdiction to undertake that otherwise familiar task.” Lin, 561 F.3d at 506. In a case such as this, to borrow the words of Professor Wechsler, “abstention of decision” is required because deciding whether the Secretary of *1213 State must mark a passport and Consular Report of Birth as Zivotofsky requests would necessarily draw us into an area of decisionmaking the Constitution leaves to the Executive alone. See Herbert Wechsler, Principles, Politics and Fundamental Law 11-14 (1961). That Congress took a position on the status of Jerusalem and gave Zivotofsky a statutory cause of action in an effort to make good on its pronouncement is of no moment to whether the judiciary has authority to resolve this dispute between the political branches. We have never relied on the presence or absence of a statutory challenge in deciding whether the political question doctrine applies. See Lin, 561 F.3d at 506; S. African Airways v. Dole, 817 F.2d 119, 123 (D.C.Cir.1987) (noting that although the court had “competence to interpret the meaning of section 306(a)(2) of the Anti-Apartheid Act,” it first had to “consider ... whether in doing so [it] would trespass on territory reserved to the political branches”); Population Inst. v. McPherson, 797 F.2d 1062, 1070 (D.C.Cir.1986) (determining first whether there was a “constitutional commitment of [the] issue to a coordinate branch,” which would prevent the court from considering a challenge to an agency’s interpretation of the Foreign Assistance and Related Programs Appropriations Act of 1985). We decline to be the first court to hold that a statutory challenge to executive action trumps the analysis in Baker and Nixon and renders the political question doctrine inapplicable.
III.
Because we conclude that Zivotofsky’s complaint raises a nonjusticiable political question, we affirm the district court’s dismissal of his suit for lack of subject matter jurisdiction.[3] Lacking authority to consider the case, we do not address the merits of the parties’ other arguments. The judgment of the district court is

Affirmed.

. A Consular Report of Birth is an official record of U.S. citizenship for a person bom abroad. See Application for a Consular Report of Birth, http://www.state.gov/ documents/organization/83127.pdf ("A Consular Report of Birth may be issued for any U.S. citizen child under age 18 who was bom abroad and who acquired U.S. citizenship at birth.”).

. The hypothetical lawsuit posed by the concurrence presents a very different issue than the one we face regarding the Executive’s decision to recognize (or not to recognize) which country exercises sovereignty over a disputed area. See Concurring Op. at 12. We do not hold, as the concurrence seems to assume, that any claim quarreling with a State Department passport policy would necessarily implicate the Recognition Power and therefore raise a political question.

. Our concurring colleague raises an interesting point about the distinction between questions we do not have jurisdiction to consider and those that are nonjusticiable. See Concurring Op. at 5-7. Although Baker makes that distinction, see 369 U.S. at 198, 82 S.Ct. 691, the Court's other cases suggest that claims raising political questions fall into both categories. See, e.g., INS v. Chadha, 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). We have consistently dismissed claims raising political questions for want of subject matter jurisdiction once we have found nonjusticiability. See Lin, 561 F.3d at 504; Schneider v. Kissinger, 412 F.3d 190, 193 (D.C.Cir.2005) (“The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary is as old as the fundamental principle of judicial review.” (internal quotation marks omitted)). We do not grapple with this dispute, if one indeed exists, because it makes no practical difference in the outcome of the case. Either way, we lack authority to consider Zivotofsky's claim.